## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| JANELLE WHITEHEAD, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 4:25-cv-00398-P |
| | § | |
| ROUNDPOINT MORTGAGE | § | |
| SERVICING LLC, TH MSR HOLDINGS | § | |
| LLC, and A & M REYES REAL ESTATE | § | |
| INVESTMENT LLC, | § | |
| | § | |
| *Defendants*. | § | |

---

## PLAINTIFF'S FIRST AMENDED COMPLAINT

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES, JANELLE WHITEHEAD, Plaintiff, complaining of ROUNDPOINT MORTGAGE SERVICING LLC, TH MSR HOLDINGS LLC, and A & M REYES REAL ESTATE INVESTMENT LLC, Defendants, in this Plaintiff's First Amended Complaint, and for cause of action would respectfully show the Court as follows:

### I.    PARTIES

1.    Plaintiff is a natural person and resident and citizen of the State of Texas and of the United States of America.

2.    Defendant Roundpoint Mortgage Servicing LLC ("**Roundpoint**") is a corporation organized under the laws of Delaware with its principal place of business in St. Louis Park, Minnesota. Roundpoint has appeared and answered.

3.      Defendant TH MSR Holdings LLC ("**Lender**") is a corporation organized under the laws of Arizona with its principal place of business in St. Louis Park, Minnesota. Lender has appeared and answered.

4.      Defendant A & M Reyes Real Estate Investment LLC. ("**A&M**") is a Texas limited liability company. A&M has made an appearance.

## II.     JURISDICTION AND VENUE

5.      The Court has jurisdiction over this lawsuit based on federal question jurisdiction pursuant to 28 U.S.C. § 1331.

6.      Venue is proper in this District under 28 U.S.C. § 1391(a)(2) and 1391(b)(2) because all or a substantial part of the property at issue is situated in this District.

## III.     AGENCY AND RESPONDEAT SUPERIOR

7.      Whenever in this petition it is alleged that a Defendant did, or failed to do, any act, thing and/or omission, it is meant that Defendant itself or its agents, officers, servants, employees, vice principals, or representatives either did or failed to do such act, thing and/or omission, and it was done with the full authorization or ratification of Defendant, and/or done in the normal routine, course and scope of the agency or employment of Defendant or its agents, officers, servants, employees, vice principals, or representatives and/or with actual and/or apparent authority of Defendant.

## IV.     FACTUAL BACKGROUND

8.      Plaintiff contends she is the owner of the property located at 2152 Pritchard Drive, Grapevine, Texas 76051("**Property**"), and is currently is possession of the Property. The Property is more particularly described as:

> LOT 14, BLOCK 1, OAKWOOD MEADOWS, AN ADDITION TO THE CITY OF GRAPEVINE, TARRANT COUNTY, TEXAS, ACCORDING TO THE

MAP OR PLAT RECORDED IN CABINET A, SLIDE 2021, PLAT RECORDS OF TARRANT COUNTY, TEXAS.

*See* **Exhibit A**. Currently, the Property has an appraised value of $467,013. *See* **Exhibit B**.

9.     Plaintiff and her late father, Jerry Whitehead, purchased the Property on February 27, 2018.

10.     Plaintiff financed the purchase of the Property by executing a Note payable to Everett Financial, Inc. d/b/a Supreme Lendering, as evidence of Plaintiff's promise to repay $340,100.00. Plaintiff and her late father executed a Deed of Trust to secure repayment of the Note. *See* **Exhibit C**. The Note and Deed of Trust will be referred to collectively herein as the "**Loan**."

11.     Upon information and belief, sometime thereafter the Loan was assigned to Lender. Upon information and belief, Roundpoint was the loan servicer and agent for Lender.

12.     Plaintiff is a chiropractor and has her own practice.

13.     In 2020, Plaintiff's business was dramatically affected as a result of the COVID-19 pandemic. Then, in February 2021, Plaintiff's business was again dramatically affected as a result of a freeze/flood. Plaintiff's business was inoperable due to mold and loss of equipment.

14.     In these connections, Plaintiff obtained several forbearance plans on the Loan. Plaintiff also obtained assistance from the Texas Homeowners Assistance program ("THA") in that THA paid Roundpoint $57,548.94 in December 2022 for Plaintiff's loan.

15.     Plaintiff's last active forbearance ended on October 31, 2023.

16.     In October 2023, Jerry Eugene Whitehead, the co-borrower and Plaintiff's father, suffered a stroke and passed away in December 2023. In the same month, Plaintiff's brother, who was also a chiropractor, became ill and was hospitalized from December 2023 through June 2024. Plaintiff was forced to take family medical leave from her own practice and travel back

and forth between Perryton, Texas and Grapevine, Texas, from October 2023 to July 2024, to conduct personal and business affairs for the family practice. In the interim, Plaintiff attempted to make partial payments but was told that "partial payments would not be applied."

17.    In June 2024, Plaintiff submitted an application to Roundpoint for forbearance. Plaintiff again attempted to partial payments but was told that "making partial payments will not help." Instead, Plaintiff was told to "wait for the approval process."

18.    On June 22, 2024, Plaintiff listed her home on the market for sale.

19.    On June 28, 2024, Plaintiff submitted her father's death certificate and Letter Testamentary to Roundpoint.

20.    On August 5, 2024, Plaintiff submitted a mortgage assistance application to Roundpoint.

21.    On August 6, 2024, Plaintiff contacted Roundpoint and spoke with Andrea. Andrea informed Plaintiff that her loss mitigation application was being reviewed for assistance and that "you have to allow the review process to continue."

22.    On August 12, 2024, Plaintiff contacted Roundpoint to inquire on her loss mitigation application. Plaintiff was told that no further action was needed at this time. Plaintiff was also told that partial payments will not help and that it was best for her to wait for the application to be reviewed. Plaintiff informed the representative that she was unable to access her account online. The representative told Plaintiff that anytime an account is in forbearance or foreclosure, the account cannot be accessed online.

23.    On August 19, 2024, Roundpoint sent Plaintiff a Notice of Posting and Foreclosure Sale ("Notice") listing the property for an October 1, 2024 foreclosure sale. The Notice was addressed to Mary Jean Tucker, Independent Administration of the Estate of Jerry

Lee Whitehead, Deceased. The Notice was mailed to 530 N Denison Street, Gainsville, Texas. *See* **Exhibit D**. However, the executrix of Jerry Eugene Whitehead's estate is Judith Marian Whitehead. Also, the Executrix's address is in Perryton, Texas. *See* **Exhibit E**.

24.    On August 30, 2024, Plaintiff contacted Roundpoint and spoke with Andrea Mills. Plaintiff was informed that her loan was in forbearance.

25.    On September 4, 2024, Plaintiff contacted Roundpoint and spoke with Wendy. Plaintiff was told that her loan was being reviewed for mortgage assistance. Plaintiff was also told that she could not do anything while her loan was being reviewed.

26.    On September 10, 2024, Plaintiff contacted Roundpoint. Plaintiff was told that Roundpoint had received Plaintiff's application and documents for mortgage assistance.

27.    Because Plaintiff was being given different answers each time she called Roundpoint, on September 16, 2024, Plaintiff emailed Roundpoint a copy of her August 5, 2024 loss mitigation application and Plaintiff's current financial documents along with an updated loss mitigation application.

28.    On September 17, 2024, Plaintiff contacted Roundpoint to inform them that she had a buyer for her home. The representative told Plaintiff to have her real estate agent send the executed contract to Roundpoint so that the October 1, 2024 foreclosure could be stopped.

29.    On September 19, 2024, Plaintiff called Roundpoint to request a payoff statement Plaintiff spoke with Jessica. Jessica told Plaintiff that the foreclosure sale had been suspended because Roundpoint had received a complete application as of September 16, 2024.

30.    On September 25, 2024, Plaintiff called Roundpoint and spoke with Majorie. Plaintiff informed Majorie that the potential buyers opted out of the contract to purchase her home. Majorie said that the October foreclosure was suspended because there was an active

application on file. Majorie told Plaintiff that she couldn't submit any payments until Plaintiff received her new plan. Marjorie also told Plaintiff that Plaintiff could call once a week to follow up on the application.

31.    On September 26, 2024, Plaintiff called Andrea Mills, Plaintiff's loss mitigation representative. Andrea confirmed that the October foreclosure sale had been cancelled.

32.    On October 8, 2024, Plaintiff received a call from Andrea Mills. Andrea stated that Plaintiff's application was accepted but that on October 4, 2024, a denial letter was sent due to the sale contract. Plaintiff told Andrea that the sale had fell through. Andrea said that she would submit a request to reopen the existing mortgage assistance application.

33.    On October 14 and 31, 2024, Plaintiff contacted Roundpoint and was told that her loss mitigation application was in progress and that nothing was needed at that time.

34.    On November 5, 2024, Plaintiff contacted Roundpoint. The representative requested that Plaintiff update her address because Roundpoint was getting returned mail. Plaintiff verified that her address was the property address. Plaintiff inquired on the status of her loss mitigation application. The representative said that the application was in review and that nothing was needed at the time.

35.    On November 14, 2024, Plaintiff contacted Roundpoint to check on the status of her application. The representative said that there were various applications on line, but that Plaintiff should submit a new application with new dates.

36.    On November 23, 2024, Plaintiff emailed Roundpoint a new loss mitigation application to lossmitigation@roundpointmortgage.com.

37.    On November 30, 2024, Plaintiff contacted Roundpoint to inquire about her loss mitigation application. Plaintiff was told that a case was opened on November 25, 2024. Plaintiff was also requested to verify her address because Roundpoint's mail was being returned.

38.    On December 12, 2024, Plaintiff received a call from Roundpoint. The representative said that Plaintiff's hardship letter had a wrong date on it. Plaintiff was instructed to send the letter and application to servicingonline@roundpointmortgage.com, which Plaintiff did.

39.    On December 21, 2024, Plaintiff spoke with Roy, a representative of Roundpoint. Roy requested that Plaintiff resubmit her loss mitigation application with a new hardship letter and email it to lossmitigation@roundpointmortgage.com, which Plaintiff did.

40.    On December 23, 2024, Plaintiff spoke with a representative of Roundpoint who confirmed that Plaintiff's application was received on December 21, 2024. Plaintiff was told that no action was needed at the time and that it could take up to 30 days to review her application because of the holidays.

41.    On January 4, 2025, Plaintiff spoke with Michelle, a representative of Roundpoint. Michelle said that there were several applications on file and that the loan was active for foreclosure, but that "nothing was in progress for the auction." Michelle suggested that Plaintiff to submit a new application.

42.    Unbeknownst to Plaintiff, the Lender and Roundpoint conducted a foreclosure of Plaintiff's Property on January 7, 2025. Plaintiff's home was sold to A&M for $405,000. *See* **Exhibit F.**

43.    Now, A&M has filed an eviction suit against Plaintiff for possession of the Property. *See* **Exhibit G**.

# V. CAUSES OF ACTION

## A. ROUNDPOINT

### *Violations of Real Estate Settlement Procedures Act*

44.    All facts and allegations set forth above are incorporated by reference herein for all purposes.

45.    Congress enacted the Real Estate Settlement Procedures Act ("**RESPA**") in 1974 to "insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. §2601(a); *see also Moreno v. Summit Mortgage Corp.*, 364 F.3d 574, 576 (5th Cir. 2004).[1]

46.    RESPA, codified at 12 U.S.C. § 2601-2617 *et seq.* and located at 12 C.F.R. § 1024 (Reg. X), sets forth certain requirements for loan servicers. Pursuant to RESPA, the Consumer Financial Protection Bureau ("**CFPB**") is tasked with promulgating said rules and regulations, as well as interpretations as may be necessary to protect consumers from abusive mortgage practices and to provide greater protection for borrowers who have fallen behind on their mortgage payments.[2]

47.    Many of these regulations have been aimed at stopping the practice of "dual tracking," a tactic employed by unscrupulous mortgage servicers. "Dual tracking occurs where a

---

[1] Numerous federal circuit courts of appeals as well as federal district courts, including the Eastern District of Texas, have analyzed RESPA and determined that it is a **remedial consumer protection statute** and as such, is to be *liberally construed to best-serve Congress's intent. See, e.g., Geoffrion v. Nationstar Mortgage LLC*, 182 F. Supp. 3d 648, 664 (E.D. Tex. 2016), *appeal dismissed* (Oct. 18, 2016) (The Court "agrees with the line of cases that has determined that RESPA is a remedial consumer-protection statute."); *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665–666 (9th Cir. 2012) (finding that "Congress intended RESPA to serve consumer-protection purposes" and stating that the statute has a remedial purpose); *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111 (2d Cir. 2007) (stating that "RESPA's overall goal [is] to protect consumers from abusive practices that result in unnecessarily high settlement charges.") (citation omitted); *Hardy v. Regions Mortgage, Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006) (finding that "RESPA is a consumer protection statute that regulates the real estate settlement process").
[2] *See* 12 U.S.C. § 2617(a).

servicer moves forward with foreclosure while simultaneously working with the borrower to avoid foreclosure."[3]

48.    "A borrower may enforce the provisions of [12 C.F.R. § 1024.41] pursuant to section 6(f) of RESPA (12 U.S.C. 2605(f))."[4] The instant mortgage is within the scope of RESPA as a "federally related mortgage loan." 12 U.S.C. § 2602.

49.    Here, Plaintiff submitted her loss mitigation application on September 16, 2024.

50.    Plaintiff repeatedly contacted Roundpoint to check the status of application. On November 14, 2024, a Roundpoint representative instructed Plaintiff to submit another loss mitigation application. Plaintiff did so on November 23, 2024, 45 days before the foreclosure.

51.    Despite several follow-ups on November 30, December 12, 21, 23, and January 4, the next thing that Plaintiff knew was that her home has been sold to A&M at the January 7, 2025 foreclosure sale.

52.    This is a classic situation of "dual tracking" that RESPA is designed to prohibit. "[12 C.F.R.] Section 1024.41(g) prohibits dual tracking, and 1024.41(a) expressly provides for a private right of action in the event the lender violates the provision."[5] "Dual tracking is the term given to situations in which the lender actively pursues foreclosure while simultaneously considering the borrower for loss mitigation options."[6]

---

[3] *Wentzell v. JPMorgan Chase Bank, Nat. Ass'n*, 627 Fed. Appx. 314, 319 (5th Cir. 2015).
[4] 12 C.F.R. § 1024.41(a).
[5] *Gresham v. Wells Fargo Bank, N.A.*, 642 Fed. Appx. 355, 359 (5th Cir. 2016).
[6] *Id.*; *see also Wentzell v. JPMorgan Chase Bank, Nat. Ass'n*, 627 Fed. Appx. 314, 319 n.3 (5th Cir. 2015) ("Dual tracking occurs 'where a servicer moves forward with foreclosure while simultaneously working with the borrower to avoid foreclosure.'") (quoting Press Release, CONSUMER FINANCIAL PROTECTION BUREAU, *CFPB Rules Establish Strong Protections for Homeowners Facing Foreclosure* (Jan. 17, 2013), *available at* http://www.consumerfinance.gov/newsroom/consumer-financial-protection-bureau-rules-establish-strong-protections-for-homeowners-facing-foreclosure/.).

53.    Roundpoint was allegedly working out options with Plaintiff to avoid foreclosure, and it even advised Plaintiff to submit another loan modification application. ***Yet, it foreclosed anyway.***

54.    Moreover, 12 C.F.R. § 1024.41(c) requires servicers to evaluate complete loss mitigation applications and then provide certain written correspondence in response. Specifically, Caliber was  required to:

> (i) evaluate the borrower for all loss mitigation options available to the borrower; and
> (ii) provide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage. The servicer shall include in this notice the amount of time the borrower has to accept or reject an offer of a loss mitigation program as provided for in paragraph (e) of this section, if applicable, and a notification, if applicable, that the borrower has the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such an appeal and any requirements for making an appeal, as provided for in paragraph (h) of this section.

12 C.F.R. § 1024.41(c)(1)(i)-(ii).

55.    Roundpoint failed to properly review Plaintiff's November 23, 2024 loan modification application. Roundpoint failed to evaluate "all" loss mitigation options for Plaitiff and failed to provide Plaintiff a written response as to the options that would be offered, if any.

56.    12 C.F.R. § 1024.41(d) also requires servicers to provide certain written notices concerning the denial of a complete loss mitigation application:

> If a borrower's complete loss mitigation application is denied for any trial or permanent loan modification option available to the borrower pursuant to paragraph (c) of this section, a servicer shall state in the notice sent to the borrower pursuant to paragraph (c)(1)(ii) of this section the specific reason or reasons for the servicer's determination for each such trial or permanent loan modification option and, if applicable, that the borrower was not evaluated on other criteria.

12 C.F.R. § 1024.41(d).

57.     Here, Plaintiff submitted another loan modification application on November 23, 2024, as instructed by Roundpoint, but Roundpoint foreclosed upon the Property while Plaintiff's application was in review. Roundpoint also never provided a written notice to Plaintiff that she was denied for a trial period or a permanent loan modification, or any reason for said denial that led to foreclosure. Therefore, Roundpoint violated 12 C.F.R. § 1024.41(d).

58.     12 C.F.R. § 1024.41(h) provides a borrower with the opportunity to appeal the denial of any loss mitigation request. Roundpoint failed to afford Plaintiff this opportunity.

59.     In the alternative, if Plaintiff's November 23, 2024 application was incomplete, 12 C.F.R § 1024.41(c)(2) requires Roundpoint to:

> **"(2) Incomplete loss mitigation application evaluation.**
> **(i) In general.** Except as set forth in paragraphs (c)(2)(ii), (iii), (v), and (vi) of this section, *a servicer shall not evade the requirement to evaluate a complete loss mitigation application* for all loss mitigation options available to the borrower by offering a loss mitigation option based upon an evaluation of any information provided by a borrower in connection with an incomplete loss mitigation application.
>
> **(ii) Reasonable time.** Notwithstanding paragraph (c)(2)(i) of this section, if a servicer has exercised *reasonable diligence in obtaining documents and information to complete a loss mitigation application*, but a loss mitigation application remains incomplete for a significant period of time under the circumstances without further progress by a borrower to make the loss mitigation application complete, a servicer may, in its discretion, evaluate an incomplete loss mitigation application and offer a borrower a loss mitigation option. Any such evaluation and offer is not subject to the requirements of this section and shall not constitute an evaluation of a single complete loss mitigation application for purposes of paragraph (i) of this section."

12 C.F.R. 1024.41(c)(2)(i), and (ii).

60.     Roundpoint did not provide any notice that Plaintiff was lacking documents in her November 23, 2024 loan modification application. In fact, Roundpoint communicate only that Plaintiff needed to update her hardship letter which she did. Roundpoint next step was the January 7, 2025 foreclosure sale.

61.    "RESPA provides that servicers who fail to comply with the provisions of the statute shall be liable to borrowers for any actual damages incurred by borrowers as a result of such failure."[7]  Under RESPA, actual damages include mental anguish and emotional distress,[8] loss of time and inconvenience,[9] time away from employment to prepare correspondence, and expenses for photocopying and otherwise preparing correspondence,[10] and late fees charged and foreclosure.[11]

62.    In addition to actual damages, a borrower may be entitled to recover statutory damages of no more than $2,000.00 if the Court finds a servicer has engaged in a pattern and practice of non-compliance with RESPA.[12]  Finally, in addition to actual and statutory damages, a borrower who prevails on a claim for a RESPA violation is be entitled to recover "the costs of the action, together with any attorneys fees incurred in connection with such action as the court may determine to be reasonable under the circumstances." [13]

63.    Due to Roundpoint's violations of RESPA, Plaintiff lost time away from work and suffered the stress and inconvenience of gathering information and having to submit and re-submit the same documents—and then Roundpoint foreclosed anyway.

64.    Plaintiff has incurred attorneys' fees and has suffered severe anxiety, stress, and mental anguish worrying about foreclosure.

---

[7] *Geoffrion v. Nationstar Mortgage LLC*, 182 F. Supp. 3d 648, 662 (E.D. Tex. 2016), *appeal dismissed* (Oct. 18, 2016); 12 U.S.C. § 2605(f)(1)(A).
[8] *Geoffrion v. Nationstar Mortgage LLC*, 182 F. Supp. 3d at 665 ("the Court finds that mental anguish damages are included within RESPA's actual damages provision.").
[9] *Johnstone v. Bank of Am., N.A.*, 173 F. Supp. 2d 809, 816 (N.D. Ill. 2001)("Johnstone argues that 12 U.S.C. § 2605(f) allows her to recover for her time and inconvenience. Again, the court agrees with Johnstone.").
[10] *Cortez v. Keystone Bank, Inc.*, 98-2457, 2000 WL 536666, at *12 (E.D. Pa. May 2, 2000)("Actual damages encompass compensation for any pecuniary loss including such things as time spent away from employment while preparing correspondence to the loan servicer, and expenses for preparing, photocopying and obtaining certified copies of correspondence.").
[11] *Johnstone v. Bank of Am., N.A.*, 173 F. Supp. 2d at 813 ("Johnstone responds by arguing that her amended complaint does, in fact, allege a causal connection between the Bank's alleged RESPA violations and the late fees and foreclosure. The court agrees with Johnstone.")
[12] 12 U.S.C. § 2605(f)(1)(B).
[13] 12 U.S.C. § 2605(f)(3).

**B.    ROUNDPOINT AND LENDER**

***Breach of Contract***

65.     All facts and allegations set forth above are incorporated by reference herein for all purposes.

66.     "The elements of a breach of contract claim are (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages to the plaintiff resulting from that breach." *Harris v. Am. Prot. Ins. Co.*, 158 S.W.3d 614, 622-23 (Tex. App.—Fort Worth 2005, no pet.).

67.     The Deed of Trust is a valid contract between Plaintiff and Lender. *Baker v. Countrywide Home Loans, Inc.,* No. 3:08-CV-0916-B, 2009 WL 1810336 at *5 (N.D. Tex. Jan. 24, 2009) (citing *Leggette v. Washington Mut. Bank*, No. 3:13-CV-2909-D, 2005 U.S. Dist. LEXIS 24405, 2005 WL 2679699, at *2 (N.D. Tex. Oct. 19, 2005) ("…under Texas law, a deed of trust is governed by the same rules of interpretation that apply to contract …"). While Roundpoint is not a party to the Deed of Trust contract, upon information and belief, Roundpoint has an agreement with Lender to service Plaintiff's loan.

68.     As shown above, Defendants breach the Deed of Trust contract by failed to comply with RESPA. Additionally, Defendants failed to comply with the Texas Property Code in its effort to foreclose which constitutes a breach of the Deed of Trust. Section 51.002 of the Texas Property Code provides the relevant requirements for a foreclosing entity. Defendants failed to provide the required notice of trustee's sale.

69.     As a proximate result of the foregoing wrongful conduct by Defendants, Plaintiff has incurred damages—Plaintiff has lost time and money taking other remedial steps to stop the wrongfully scheduled and conducted foreclosure. Plaintiff also incurred court costs and reasonable and necessary attorneys' fees, of which she seeks recovery.

70.     Plaintiff request that the Court find that Defendants breached the Deed of Trust contract.

### *Texas Debt Collection Practices Act ("TDCA") Violations*

71.     All facts and allegations set forth above are incorporated by reference herein for all purposes.

72.     The TDCA provides remedies for wrongful debt collection practices used by a debt collector in debt collection. *See* Tex. Fin. Code §§ 392.001−.404; *see also Ford v. City State Bank of Palacios*, 44 S.W.3d 121, 135 (Tex. App.—Corpus Christi 2001, no pet.).

73.     "Debt collection" is defined as the act or practice "in collecting, or in soliciting for collection, consumer debts that are due or alleged to be due a creditor." Tex. Fin. Code § 392.001(5).

74.     Defendants violated the TDCA. *See* Tex. Fin. Code § 392.001 *et seq*.

75.     To state a claim for a TDCA violation, the plaintiff is required to show that the defendant: (1) is a debt collector; (2) committed a wrongful act in violation of Tex. Fin. Code § 392.01 *et seq.*; (3) against the plaintiff; and (4) as a result, the plaintiff was injured. *See McCaig v. Wells Fargo Bank (Texas), N.A.*, 788 F.3d 463, 480-81 (5th Cir. 2015) ("[t]he statutory text [of the TDCA] contains no intent requirement . . . as suggested by the statute's plain text, district courts have recognized that facially innocuous misrepresentations made in the course of an attempt to collect a debt constitute a violation of [the TDCA].."); *see also Catherman v. First State Bank*, 796 S.W.2d 299, 302 (Tex. App.—Austin 1990, no writ).

76.     The debt in question relating to Plaintiff's home is a "consumer debt" within the meaning of such statute because the debt is an obligation for personal, family, or household

purposes. Tex. Fin. Code § 392.001(1), (2). Furthermore, Plaintiff is a "consumer" within the meaning of Tex. Fin. Code § 392.001.

77.     A "debt collector" is "a person who directly or indirectly engages in debt collection." *Id.* § 392.001(6). This definition also includes a mortgage servicer. *See Miller v. BAC Home Loans Servicing, LP*, 726 F.3d 717, 723 (5th Cir. 2013). Defendant is a debt collector.

78.     Defendants' acts and omissions as alleged *supra* constitute TDCA violations. The TDCA provides that, in debt collection or obtaining information concerning a consumer, a debt collector may not use a fraudulent, deceptive, or misleading representation that employs the following practices:

> (8) misrepresenting the character, extent, or amount of a consumer debt, or misrepresenting the consumer debt's status in a judicial or governmental proceeding. Tex. Fin. Code Ann. § 392.304(a)(8).

> (19) using any other false representation or deceptive means to collect a debt or obtain information concerning a consumer. Tex. Fin. Code § 392.304(a)(19).

79.     Defendants also violated Tex. Fin. Code §392.301(a)(8):

> (8) using threats, coercion, or attempts to coerce that employ any of the following practices: threatening to take an action prohibited by law.

80.     Defendants violated § 392.304(a)(8) when when it failed to comply with RESPA, and when it noticed a foreclosure sale despite its failure to comply with the Texas Property Code. As a result, Defendants "led [Plaintiff] to think differently with respect to the character, extent, amount, or status of [her] debt." *Ingram v. Beneficial Fin., Inc.*, No. 3:13-CV-4037-L, 2015 WL 1443110, at *9 (N.D. Tex. Mar. 30, 2015). Defendant set the foreclosure sale in flagrant disregard of the Texas Property Code.

81.     Section 392.304(a)(19) is a catch-all provision that prohibits debt collectors from "using any other false representation or deceptive means to collect a debt or obtain information concerning a consumer." *Birchler v. JPMorgan Chase Bank*, No. 4:14-CV-81-ALM, 2015 WL 1939438, at \*5 (E.D. Tex. Apr. 29, 2015). Plaintiff maintains that Defendants violated § 392.304(a)(19) when it failed to comply with the express provisions of the Deed of Trust.

82.     Defendants violated § 392.301(a)(8) when it scheduled the foreclosure sale absent a valid contractual right to foreclose. The Fifth Circuit Court of Appeals has acknowledged that even if a loan is in default, a lender may still violate § 392.301(a)(8). "In determining whether foreclosure would be prohibited by law, however, what matters is whether the mortgagor has a ***right to foreclose***, not whether the debt is considered in default." *McCaig v. Wells Fargo Bank (Texas), N.A.*, 788 F.3d 463, 478 (5th Cir. 2015). Defendants' acts and omissions amounted to violations of RESPA and the Texas Property Code, and thus Defendants took "an action prohibited by law" when it noticed the foreclosure of Plaintiff's home.

83.     The Supreme Court of Texas has opined that a party can recover injunctive relief and actual damages that are a "reasonably foreseeable result of the wrongdoer's conduct." *Brown v. Oaklawn Bank*, 718 S.W.2d 678, 680 (Tex. 1986). The Northern District has noted "that *Brown* suggests that the harm claimed must have been merely a 'reasonably foreseeable result' of alleged misconduct under the TDCA [but] it does not require that the harm be the sole result of a defendant's acts." *Clark v. Deutsche Bank Nat'l Tr. Co.*, 3:14-CV-3590-B, 2016 WL 931216, at \*7 (N.D. Tex. Mar. 11, 2016)(emphasis added).  Thus, the causation standard for a TDCA violation is akin to the "producing cause" standard set forth in the Deceptive Trade Practices Act. *See* Tex. Bus. & Com. Code § 17.50(a); *Prudential Ins. Co. of Am. v. Jefferson Associates, Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995).

84.    Actual damages recoverable under the TDCA include damages for mental anguish and do not first require a showing of physical injury. *Ledisco Fin. Servs. v. Viracola*, 533 S.W.2d 951, 957 (Tex. App.—Texarkana 1976, no writ.); *Monroe v. Frank*, 936 S.W.2d 654, 661 (Tex. App.—Dallas 1996, writ dism'd).

85.    Also, pursuant to Tex. Fin. Code § 392.403, Plaintiff is entitled to recover his attorneys' fees reasonably related to the amount of work performed and costs for all actions in the trial court and on appeal.

86.    As a result of Defendant's TDCA violations, Plaintiffs suffered mental anguish and emotional distress. Plaintiff is constantly worried and confused about the status of her loan. She also lost time away from work and suffered the inconvenience of having to resolve the matter.

### *Suit to Set Aside the Foreclosure Sale and Cancel Trustee's Deed*

87.    All allegations and facts set forth above are incorporated by reference herein for all purposes.

88.    For a sale under a deed of trust to be valid, the terms set out in the deed of trust must be **strictly followed**. *Kourosh Hemyari v. Stephens,* 355 S.W.3d 623 (Tex. 2011). In other words, "[a] trustee has no power to sell the debtor's property, except such as may be found in the deed of trust." *Slaughter v. Qualls*, 162 S.W.2d 671, 675 (Tex. 1942).

89.    "Because a power of sale under a deed of trust is a harsh method of collecting debts and of disposing of another's property, it can only be exercised by **strict compliance** with the note and conditions of sale." *Bonilla v. Roberson*, 918 S.W.2d 17, 21 (Tex. App.—Corpus Christi 1996) (emphasis added).

90.    "A foreclosure sale not conducted in accordance with the terms of the deed of trust gives rise to a cause of action to set aside the sale and the resulting trustee's deed." *Wells Fargo Bank, N.A. v. Robinson,* 391 S.W.3d 590 (Tex. App.—Dallas 2012, no pet.); *see also Bonilla*, 918 S.W.2d at 21-22 ("When a party with a property interest wishes to challenge a [foreclosure] sale's validity, the proper action is to bring a cause of action to set aside the sale and cancel the trustee's deed.").

91.    Plaintiff contends that Defendants' failure to strictly adhere to the terms of the Deed of Trust ***invalidates the trustee's sale***. *Lido Intern., Inc. v. Lambeth,* 611 S.W.2d 622 (Tex. 1981).

92.    Defendants failed to comply with the RESPA regulations which were explicitly incorporated to the Deed of Trust and failed to comply with Texas Property Code § 51.002. Therefore, Plaintiff maintains that the instant foreclosure was unlawfully conducted in violation of the Deed of Trust, and therefore, was void and could not pass title to A&M. *Houston First American Sav. v. Musick,* 650 S.W.2d 764, 768–69 (Tex. 1983) (holding that the substitute trustee's deed conveying the property is ***invalid because the trustee failed to comply with the terms of the deed of trust and applicable law*** and explaining that conveyance of property "[does] not conclusively establish that foreclosure sale . . . conformed to conditions set out in deed") (quoting *Houston Oil Co. of Texas v. Hayden*, 104 Tex. 175, 135 S.W. 1149 (1911)); *see Michael v. Crawford*, 108 Tex. 352, 193 S.W. 1070 (1917) (providing that the trustee must ***strictly adhere to the terms of the power of sale*** because the power "admits of no substitution and no equivalent"); *see also G4 Tr.*, 2011 WL 3835656, at *8−10 (notice of sale ***did not include street address for trustee*** pursuant to Tex. Prop. Code § 51.0075(e) and, hence, deed

of trust terms were not strictly followed; thus, sale was *void*) (emphasis added);  *In re George W. 59 Inv., Inc.*, 526 B.R. 650, 658 (N.D. Tex. 2015) (same).

93.    Accordingly, the January 7, 2025 foreclosure sale should be set aside, and the trustee's deed should be canceled.

## C.    A&M

### *Suit to Quiet Title and Trespass to Try Title*

94.    Plaintiff realleges all facts and allegations contained above, inclusive, and incorporate the same herein by reference.

95.    Plaintiff brings an action to quiet title.  "The elements of a suit to quiet title are 1) plaintiff has an interest in a specific property; 2) title to the property is affected by a claim by the defendant; and 3) the defendant's claim, though facially valid, is invalid or unenforceable." *Wagner v. CitiMortgage*, Inc., 995 F. Supp. 2d 621, 626 (N.D. Tex. 2014).

96.    To prevail in a trespass to try title action, a plaintiff must usually (1) prove a regular chain of conveyances from the sovereign, (2) establish superior title out of a common source, (3) prove title by limitations, or (4) prove title by prior possession coupled with proof that possession was not abandoned.  *Martin v. Amerman*, 133 S.W.3d 262, 265 (Tex. 2004).

97.    Plaintiff has an interest in the Property, as it is her homestead. Defendants Lender and Roundpoint have apparently sold Plaintiff's Property at a January 7, 2025 foreclosure sale. Defendants' actions in selling Plaintiff's Property were wrongful because they were in violation of the Deed of Trust, RESPA and Texas Property Code.  As such, A&M's claims to the title and possession of the Property are improper.  Moreover, to the extent that A&M claims title to the Property, Plaintiff has a superior claim to title out of a common source.

98.    Plaintiff seeks the judgment of the Court to quiet A&M's claims, and award and declare clear and uncontested title and possession of the property to Plaintiff.

## VI. REMEDIES

### *Accounting*

99.    A request for an accounting is an equitable remedy used to determine the amount of damages. *See Hutchings v. Chevron U.S.A., Inc.*, 862 S.W.2d 752, 762 (Tex. App.—El Paso 1993, writ denied). ***It is a flexible, equitable remedy that may apply in various scenarios according to the sound discretion of the trial court***. *See, e.g., Gifford v. Gabbard,* 305 S.W.2d 668, 672 (Tex. Civ. App.—El Paso 1957, no writ); *Southwest Livestock & Trucking Co.,* 884 S.W.2d 805, 810 (Tex. App.—San Antonio 1994, writ denied).

100.    Plaintiff requests an Order for an accounting of all transactions on the mortgage loan.

### *Declaratory Judgment*

101.    This action is being brought pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57.

102.    A declaratory judgment is a remedial measure that determines the rights of the parties and affords relief from uncertainty with respect to rights, status, and legal relations. *See Halliburton Energy Servs., Inc. v. Axis Tech., LLC*, 444 S.W.3d 251, 262 (Tex. App.—Dallas 2014, no pet.).

103.    Pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, Plaintiff requests that this Court enter a declaratory judgment that the RESPA regulations and Texas Prop. Code, are part of the Deed of Trust.

## VII. DAMAGES

104.    As a proximate result of the above, Plaintiff has incurred the following actual damages:

>   a.  reasonable and necessary attorneys' fees and costs in the proceedings before this Court, and those fees required for any appeal to the Court of Appeals and thereafter to the Supreme Court;
>
>   b.  the loss of creditworthiness and the stigma of foreclosure;
>
>   c.  mental anguish and acute psychological trauma;
>
>   d.  the loss of title to her home and the equity contained therein;
>
>   e.  general and special damages as result of the breach of the Deed of Trust;
>
>   f.  direct and indirect damages as a result of the Lender and Roundpoint's TDCA violations; and
>
>   g.  the value of time lost in attempting to correct Defendants' errors.

105.    Plaintiff seeks monetary relief over $200,000, but not more than $1,000,000.

## VIII. CONDITIONS PRECEDENT

106.    All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

## IX. DEMAND FOR JURY

107.    Plaintiff demands a jury trial.

## X. NOTICE OF INTENT TO USE DEFENDANT'S DOCUMENTS

108.    Plaintiff hereby gives notice of her intention to use at trial or any hearing any document produced by Defendants in response to written discovery.

## XII. PRAYER

**WHEREFORE**, Plaintiffs request that:

a.  the Court find that Defendants Lender and Roundpoint breached the Deed of Trust;

b.  the Court award general and special damages as a result of Defendants Lender and Roundpoint's breach of contract;

c.  the Court find that Defendants violated the TDCA and pursuant to the TDCA, Plaintiff is entitled to injunctive relief;

d.  the Court find that the actions of Defendants were so deplorable that Plaintiff is entitled to exemplary damages;

e.  the Court declare that the RESPA regulations and Tex. Prop. Code § 51.0075(e) are part of the Deed of Trust;

f.  Plaintiff recover her actual and consequential damages, out-of-pocket damages, including but not limited to, damages for clouding the title/slander of title concerning said residence, harm to credit reputation, credit worthiness, and credit history, mental anguish, emotional distress, anxiety, depression, humiliation, and the value of time lost trying to remedy the problem, against Defendants;

g.  Plaintiff recover her reasonable and necessary attorneys' fees in this action and resulting writs or appeals; or, in the alternative, Plaintiff's attorneys have costs of court and reasonable and necessary attorneys fees in this action and resulting writs or appeals, and the same be taxed as costs and ordered paid directly to Plaintiff's attorneys, who may enforce the order for fees in their own name;

h.  Defendant be ordered to render an accounting to Plaintiff of the amounts paid and owed;

i.  that upon final trial, the foreclosure sale be set aside, and the substitute trustee's deed be canceled, and the note reinstated according to law without applicable late charges, penalties, and interest, or, in the alternative, Plaintiff recover her damages for loss of equity in the property;

j.  that the Court find that the Substitute Trustee's Deed in favor of Defendant A&M is void and should, in all things, be set aside and vacated and title be shown to be vested in Plaintiff, and Plaintiff be granted possession of the property; and

k.  such other and further relief in equity and at law to which Plaintiff may be justly entitled.

Respectfully submitted,

/s/   *David M. Vereeke*
J.B. Peacock, Jr.
State Bar No. 15678500
David M. Vereeke
State Bar No. 20547500
**GAGNON, PEACOCK & VEREEKE, P.C.**
1349 Empire Central Drive
Suite 500, Lock Box 5
Dallas, Texas 75247
Telephone:  (214) 824-1414
Facsimile:  (214) 824-5490
Email:  attorneys@gapslaw.com

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

The following document was served on Taneska Jones and Jay B. Newton (and all parties receiving electronic service) per the local and federal rules of procedure via either forwarding same as first-class mail with the United States Postal Service or by causing same to be filed in this case via electronic transmission via portable document format (.pdf) to the EM/ECF Internet web portal for this Court in this Case on 18th day of April 2025.

/s/   *David M. Vereeke*
Of Gagnon, Peacock & Vereeke, P.C.